Anthony M. Barnes (Bar No. 199048)
Jason Flanders (Bar No. 238007)
Email: amb@atalawgroup.com
AQUA TERRA AERIS LAW GROUP LLP
4030 Martin Luther King Jr. Way
Oakland, CA 94609
Phone: (917) 371-8293

Benjamin A. Harris (Bar No. 313193)
Email: ben@lawaterkeeper.org
LOS ANGELES WATERKEEPER
120 Broadway
Santa Monica, CA 90401
Phone: (310) 394-6162

*Attorneys for Plaintiff*
LOS ANGELES WATERKEEPER

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a California non-profit association,<br><br>Plaintiff,<br><br>v.<br><br>ESTES EXPRESS LINES, INC., dba Estes West, a California corporation,<br><br>Defendant. | Civil Case No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

LA Waterkeeper ("LA Waterkeeper" or "Plaintiff"), by and through its counsel, hereby alleges:

## I.    **JURISDICTION AND VENUE**

1.    This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.    On February 10, 2022, LA Waterkeeper issued a 60-day notice letter ("Notice Letter"), to Estes Express Lines, Inc. ("Estes" or "Defendant"), as the owners and operators of the Estes West, Sun Valley Terminal ("Sun Valley") facility under its control. The Notice Letter informed Defendant of their violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollutant Discharge Elimination System (NPDES) General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No*. 2014-0057-DWQ and amended by Order No. 2015-0122 –DWQ and incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) Total Maximum Daily Loads ("TMDL") Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use, and as subsequently amended by Order 2018-0028-DWQ (effective July 1, 2020) ("General Permit" or "Storm Water Permit") and the Clean Water Act at the industrial facility located at 11801 Sheldon Street, Sun Valley, CA 91352 with Waste Discharger Identification Number ("WDID") 4 19I020941 ("Facility").

3.    The Notice Letter informed Defendant of LA Waterkeeper's intent to file suit against Defendant to enforce the Storm Water Permit and the Clean Water Act.

4.    The Notice Letter was sent to Estes' Chief Executive Officer, Manager of the Sun Valley Terminal, and the Agent for Service of Process (40 C.F.R. § 135.2(a)(2)).

The Notice Letter was also sent to the Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Acting Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Los Angeles Region, ("Regional Board") as required by Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A). The Notice Letter is attached hereto as **Exhibit A** and is fully incorporated herein by reference.

5. More than sixty (60) days have passed since the Notice Letter was served on the Defendant and the State and Federal agencies. LA Waterkeeper is informed and believes, and thereon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

6. Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

7. Plaintiff seeks relief for Defendant's substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from industrial activities at the Facility.

## II. **INTRODUCTION**

8. With every significant rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the Facility referenced herein, pour into the storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering marine and river environments each year. These surface waters, known as Receiving Waters, are ecologically sensitive areas. Although pollution and habitat destruction have drastically diminished once abundant and varied

fisheries, these waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contain sediment, heavy metals, such as aluminum, iron, chromium, copper, lead, mercury, nickel, and zinc, as well as high concentrations of nitrate and nitrite, and other pollutants. Exposure to polluted storm water harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

9.     High concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. TSS has been shown to alter predator-prey relationships (for example, turbid water may make it difficult for fish to hunt prey). Deposited solids alter fish habitat, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons, are absorbed onto TSS. Thus, higher concentrations of TSS result in higher concentrations of toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces. Storm water discharged with high pH can damage the gills and skin of aquatic organisms and cause death at levels above 10 standard units. The pH scale is logarithmic, and the solubility of a substance varies as a function of the pH of a solution. A one-whole-unit change in SU represents a tenfold increase or decrease in ion concentration. If the pH of water is too high or too low, the aquatic organisms living within it will become stressed or die.

10.    This complaint seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert

witness fees, for Defendant's substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from Defendant's operations at the Facility.[1]

11.     LA Waterkeeper specifically alleges violations regarding Defendant's discharge of pollutants from the Facility into waters of the United States; violations of the monitoring, reporting, and best management practice requirements; and violations of other procedural and substantive requirements of the Storm Water Permit and the Clean Water Act, are ongoing and continuous.

## III.     PARTIES

### A.     Los Angeles Waterkeeper

12.     LA Waterkeeper is a non-profit 501(c)(3) public benefit corporation organized under the laws of the State of California. LA Waterkeeper's main office is located at 120 Broadway, Suite 105, Santa Monica, California 90401.

13.     LA Waterkeeper's members live and/or recreate in and around Los Angeles. LA Waterkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of local surface waters. To further these goals, LA Waterkeeper actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and others.

14.     LA Waterkeeper members work, own homes and live in Los Angeles County and use and enjoy the waters near the Facility, including the Tujunga Wash and the Los Angeles River and the bordering parks, pathways, golf courses and athletic fields, and further downstream Queensway Bay, and Junipero Beach ("Receiving Waters") for biking, boating, kayaking, viewing wildlife, walking, running, and engaging in scientific study, including habitat monitoring and restoration activities.

15.     Discharges of polluted storm water and non-storm water from the Facility degrade water quality and harm aquatic life in the Tujunga Wash, the Los Angeles River

---

[1] The Facility is fully described in Section V below.

and its estuary, Queensway Bay, and Junipero Beach, and impair LA Waterkeeper's and its members' use and enjoyment of those waters.

16.     The violations of the Storm Water Permit and Clean Water Act at the Facility are ongoing and continuous, including but not limited to Defendant's discharge of polluted storm water from the Facility. Thus, the interests of LA Waterkeeper's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Storm Water Permit and the Clean Water Act.

17.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and its members, for which they have no plain, speedy or adequate remedy at law.

18.     The interests of LA Waterkeeper and LA Waterkeeper's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Storm Water Permit. The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

**B.     The Owners and/or Operators of the Facility**

19.     LA Waterkeeper is informed and believes, and thereon alleges, that Estes maintains its headquarters at 3901 West Board Street, Richmond, VA 23230.

20.     LA Waterkeeper is informed and believes, and thereon alleges, that Estes is the owner and operator of the Sun Valley Terminal.

21.     LA Waterkeeper is informed and believes, and thereon alleges, that that Estes Express Lines, Inc.is an active California corporation registered in California.

22.     LA Waterkeeper is informed and believes, and thereon alleges, that the name and address of the Registered Agent for CSC – Lawyers Incorporating Service 2710 Gateway Oaks Dr., Ste. 150N, Sacramento, CA 95833,

23.     LA Waterkeeper refers to Defendant Estes and its management herein as the "Owners/Operators" of the Facility.

## IV.    STATUTORY BACKGROUND

### A.    The Clean Water Act

24.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

25.    Section 402(p) of the CWA establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342.

26.    Section 301(b) of the Clean Water Act requires that, by March 31, 1989, all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

27.    The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. §§ 1311(a) and 1342.; *see* 40 C.F.R. § 122.26(c)(1).

28.    The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

29.    The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological

materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

30.     The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.

31.     "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7). "Navigable waters" means "the waters of the United States." 33 U.S.C. 1362(7).

32.     The EPA promulgated regulations for the Section 402 NPDES permit program defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. *Id.*

33.     The Clean Water Act confers jurisdiction over non-navigable waters that are tributaries to traditionally navigable waters where the non-navigable water at issue has a significant nexus to the navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

34.     A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.

35.     A significant nexus is also established if waters that are tributary to

navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-1001.

36.  Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

37.  The Defendant is a "person[s]" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

38.  An action for injunctive relief is authorized under Section 505(a) of the CWA, 33 U.S.C. § 1365(a).

39.  Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4), each separate violation of the CWA occurring after November 2, 2015 commencing five years prior to the date of Notice of Violation and Intent to File Suit subjects Estes to a penalty of up to $59,937 per day per violation.

40.  Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.

**B.   California's Storm Water Permit**

41.  Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. *See id.*

42.  Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the Administrator of

the EPA has authorized California to issue NPDES permits, including general NPDES permits. California has designated the State Board and the Regional Boards to administer its NPDES program. *City of Rancho Cucamonga v. Regional Water Quality Control Bd.*, 135 Cal. App. 4th 1377, 1380-81 (2006). In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001. The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1342(b), (p), and 40 C.F.R § 123.25. Violations of the Storm Water Permit are also violations of the CWA. Storm Water Permit, Section XXI(A).

43.     Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States. 33 U.S.C. § 1313(a). The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards. *See* 33 U.S.C. § 1311(b)(1)(C); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. § 122.44(d)(1).

44.     The State Board elected to issue a statewide general permit for industrial discharges. The State Board issued the Storm Water Permit on or about November 19, 1991, modified the Storm Water Permit on or about September 17, 1992, and reissued the Storm Water Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

45.     On July 1, 2015, the current Storm Water Permit became effective and was issued as *NPDES General Permit No. CAS000001 State Water Resources Control Board Water Quality Order No. 2014-0057-DWQ*. Storm Water Permit, Section I(A) (Finding 4).

46.     On November 6, 2018, the State Board amended the Storm Water Permit with Order No. No. 2015-0122 –DWQ, incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use ("2018 Permit Amendment").

47.     In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an individual NPDES permit. Storm Water Permit, Section I(A) (Findings 8, 12). Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. Storm Water Permit, Section I(A) (Finding 17), Section II(B).

### C.     The Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations

48.     The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. Storm Water Permit, Discharge Prohibition III(B).

49.     Effluent Limitation V(A) of the Storm Water Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand, TSS, oil and grease ("O&G"), pH, and fecal coliform.

50.     Discharge Prohibition III(C) of the Storm Water Permit prohibits storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

51.     Under the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b). Storm Water Permit, Effluent Limitation

V(A). EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards. *See* Final National Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges From Industrial Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); Multi-Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008; Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

52.    The EPA's most recent, 2021 Parameter Benchmark Values for the following parameters, among others, are as follows: TSS—100 mg/L; O&G—15 mg/L; aluminum—1.1 mg/L; iron—1 mg/L; cadmium—0.0018 mg/L; copper—0.0059 mg/L; zinc—0.12 mg/L; pH—6-9 s.u.; chemical oxygen demand—120 mg/L and nitrate plus nitrite nitrogen—0.68 mg/L.

53.    The Storm Water Permit contains Numeric Action Levels ("NALs") that generally mirror the 2008 EPA Benchmark Values. *See* Storm Water Permit, Section I(M)(Finding 62). Annual NALs, not accounting for water hardness, for the following parameters are: pH—6.0 – 9.0 standard units; TSS—100 mg/L; copper—0.0332 mg/L; zinc—0.26 mg/L; nickel—1.02 mg/L;  iron—1.0 mg/L; nitrate plus nitrite as nitrogen ("N+N")—0.68 mg/L; O&G—15 mg/L; and aluminum—0.75 mg/L. Storm Water Permit, Table 2 at 47. Instantaneous Maximum NALs, for the following parameters are: pH—6.0 – 9.0 s.u.; TSS—400mg/L; O&G—25mg/L. *Id*. Additional EPA Benchmarks for heavy metals, which depend on the hardness of the receiving water, also apply to storm water discharges from the Facility.

54.    Receiving Water Limitation VI(B) of the Storm Water Permit prohibit storm water discharges from adversely impacting human health or the environment.

55.    Discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the Storm Water Permit's Receiving Water Limitation. Storm Water Permit, Section VI(B).

56.    Receiving Water Limitation VI(A) of the Storm Water Permit prohibit storm

water discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

57.     Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various Regional Boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

58.     The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan which contains WQS for water bodies within its geographic area.

59.     The State Water Quality Control Board, Los Angeles Region, has issued the Water Quality Control Plan for the Los Angeles Region ("the Basin Plan") to establish water quality objectives, implementation plans for point and non-point source discharges, prohibitions, and to further statewide plans and policies. The Basin Plan sets forth water quality objectives for dissolved metals such as aluminum, arsenic, and mercury. Basin Plan, Table 3.8. The Basin Plan states that the waters shall not receive sediment, settleable materials, or suspended materials that cause nuisance or adversely affect the waters' beneficial uses. *Id*. at 3-44. The Basin Plan also provides that "Toxic pollutants shall not be present at levels that will bioaccumulate in aquatic life to levels which are harmful to aquatic life or human health." *Id*. at 3-24.

60.     The Basin Plan specifies potential and existing beneficial uses for the Los Angeles River including municipal and domestic supply, industrial and service supply, groundwater recharge, warm freshwater habitat, wildlife habitat, and wetland habitat. Basin Plan, Table 2-1. The Basin Plan further specifies beneficial uses for the Los Angeles River Estuary, at Queensway Bay. *Id*.

61.     Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act.

62.     Reach 3 of the Los Angeles River is listed for the following water quality impairments: copper, lead, nitrate-N, nitrite-N, ammonia, cadmium, indicator bacteria, algae, and oil. Downstream of Reach 2 (Reach 1) of the Los Angeles River is also impaired for zinc, cadmium, pH, and cyanide. Queensway Bay is 303(d)-list impaired for Chlordane, Toxicity and Trash. Lower reaches of the Los Angeles River, the Los Angeles River Estuary, and the Los Angeles Inner Harbor are also listed for impairments on the Section 303(d) list. Queensway Bay is 303(d)-list impaired for Chlordane, Toxicity and Trash. The Receiving Waters are impaired, and Defendant's discharges of pollutants above the WQS contributes to the continued impairment of the receiving waters' beneficial uses.

63.     In addition, EPA has promulgated WQS for toxic priority pollutants in all California water bodies ("California Toxics Rule" or "CTR"), which apply to the Receiving Waters, unless expressly superseded by the Basin Plan. 40 C.F.R. § 131.38. The CTR sets forth lower numeric limits for zinc and other pollutants; CTR criteria can be as low as 0.12 mg/L for zinc in freshwater surface waters with water hardness calculation of 50 mg/L.[2]

64.     The CTR includes further numeric criteria set to protect human health and the environment in the State of California. *See* Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at: https://www.epa.gov/wqs-tech/water-quality-standards-establishment-numeric-criteria-priority-toxic-pollutants-state.

65.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable WQS are violations of the Storm Water Permit's Receiving Water Limitations and Section VI(A) of the Storm Water Permit.

### D.     The Storm Water Permit's Numeric Effluent Limitations

---

[2] The CTR numeric limits, or "criteria," are expressed as dissolved metal concentrations in the CTR, but the Storm Water Permit requires permittees to report their sample results as total metal concentrations. *See* Storm Water Permit, Attachment H at 18.

66.     Effective July 1, 2020, the Storm Water Permit establishes numeric effluent limitations ("NELs") for facilities that discharge storm water associated with industrial activities into water bodies that have approved TMDLs set forth in Storm Water Permit, Attachment E. TMDLs in place for pollutants discharged from industrial facilities to the Los Angeles River and Los Angeles Harbor include zinc, cadmium, copper and lead. LA Waterkeeper is informed and believes, and thereon alleges, that recent storm water sampling results from the Facility exceeded the zinc NEL for the Los Angeles River.

67.     An instantaneous maximum NEL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year[3] exceeds the instantaneous maximum NEL value. Storm Water Permit, Section V(C)(1). LA Waterkeeper in informed and believes, and thereon alleges, that there were four (4) zinc and two copper NEL exceedances in the 2020-2021 reporting year recorded at the Facility. In the 2021-2022 reporting year there have been two (2) zinc NEL exceedances thus far.

68.     An exceedance of an NEL is a violation of the Storm Water Permit and the Clean Water Act. *Id.*

69.     The Facility is subject to the Los Angeles River TMDL requirements for metals, which include the following NELs: copper—0.06749 mg/L, lead—0.094 mg/L, cadmium—0.0031 mg/L, and zinc—0.159 mg/L. Storm Water Permit, Attachment E.

### E.     The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements

70.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. Storm Water Permit, Sections I(I) (Finding 54), X(B). The SWPPP must identify and evaluate sources of

---

[3] A reporting year under the General Permit is July 1 to June 30.

pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. Storm Water Permit, Section X(G). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. Storm Water Permit, Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. Storm Water Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. Storm Water Permit, Section I(D) (Finding 32), Section X(C).

71.     The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and its current responsibilities for developing and implementing the SWPPP. Storm Water Permit, Section X.

72.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. Storm Water Permit, Section X.

73.     The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. Storm Water Permit, Section X(A)-(B). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. Storm Water Permit, Section X(B) and Section XV.

74.     The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. Storm Water Permit, Sections I(J) (Finding 55) and X(B)(1). Significant SWPPP revisions must be certified and submitted by the discharger via the State Board's electronic database, called the Storm Water Multiple Application & Report Tracking System ("SMARTS") within 30 days. Storm Water Permit, Section X(B)(2). Dischargers are required to submit revisions to the SWPPP that are determined to not be significant every three (3) months in the reporting year. *Id.* at Section X(B)(3); Storm Water Permit, Fact Sheet, Section II (I)(1).

### F.     The Storm Water Permit's Monitoring Implementation Program Requirements

75.     The Storm Water Permit requires facility operators to develop and implement a Monitoring Implementation Plan ("MIP"). Storm Water Permit Sections X(I) and XI(A)(D). The MIP must ensure that storm water discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the Storm Water Permit. Storm Water Permit Section XI. The MIP must ensure that practices at the facility to prevent or reduce pollutants in storm water and authorized non-storm water discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. *Id.*

76.     Further objectives of the MIP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges are in compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. Storm Water Permit, Section XI.

77.     The MIP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. *Id*.

78.     The Storm Water Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the permit. Storm Water Permit, Sections I(J) (Findings 55-56) and XI.

79.     Section XI(A)(4) of the Storm Water Permit require that the MIP shall be revised as necessary to ensure compliance with the Storm Water Permit.

80.     Section XI(A) of the Storm Water Permit require dischargers to conduct monthly visual observations of storm water discharges.

81.     Section XI(A)(2) of the Storm Water Permit requires dischargers to document the presence of any floating and suspended materials, O&G, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See* Storm Water Permit, Section XI(A)(3). The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. Storm Water Permit, Section X(B)(1).

82.     The Storm Water Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. Storm Water Permit, Section XI(B)(4).

83.     Section XI(B)(1) of the Storm Water Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("Qualifying Storm Event" or "QSE").

84.     Section XI(B)(2) of the Storm Water Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

85.     Section XI(B)(6) of the Storm Water Permit requires dischargers to analyze storm water samples for TSS, O&G, pH, and additional parameters identified by the discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs, and additional parameters required by the Regional Water Board.

86.     The Facility's NOI classifies the Facility under Standard Industrial Classification Code ("SIC") 4213, covering trucking, except local. Under SIC Code 4213, Estes is required to sample storm water for TSS, O&G, and pH. Facilities must also sample and analyze for additional parameters identified on a facility-specific basis to reflect a facilities' pollutant source assessment, as required by the General Permit and the Regional Board, and additional parameters related to receiving waters with 303(d) listed impairments. Storm Water Permit, Section XI.B.6. When self-reporting storm water sample results, Defendant samples for those pollutants listed above in this paragraph and due to the Los Angeles River Nitrogen and Metals TMDL and pollutant source assessment, Defendant also samples for copper, zinc, and N+N.

87.     Section XVI of the Storm Water Permit requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a Discharger complies with, and has addressed all applicable requirements of this General Permit, an explanation for any non-compliance of requirements within the reporting year, as

indicated in the Compliance Checklist, an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

## V.      STATEMENT OF FACTS

### A.      Estes Facility Site Description, and Industrial Activities and Pollutant Sources at the Facility

88.      Defendant operates an industrial facility located at 9120 San Fernando Road, Sun Valley, CA 91352, in close proximity to the Tujunga Wash. The Facility's NOI states that the site consists of approximately 3.5 acres. The Facility's primary industrial purpose is a trucking terminal for cargo transportation and distribution. The Facility's SWPPP last updated in October 2020 ("Facility SWPPP") lists the Facility operates Monday through Friday, 1:00 am to 10:00 pm.

89.      LA Waterkeeper is informed and believes, and thereon alleges that industrial activities at the site, many of them conducted outdoors and exposed to storm water include cargo loading and unloading, equipment storage, truck fueling and maintenance activities, cargo trailer and truck storage, truck washing, above ground tank storage for oil and waste oil, and waste handling and disposal. Cargo loading and unloading typically occurs at the loading/unloading docks where forklifts are used for both loading and unloading cargo. These activities occur at following areas identified in the Facility SWPPP: loading/unloading dock, warehouse, maintenance shop, materials storage area, truck washing area, and trailer parking area. Freight is offloaded, moved with forklifts, sorted, and stored inside the warehouse until reloaded for additional transportation. Pollutants from these activities accumulate at the Facility and contribute to pollutants in storm water. Pollutants of concern at the Facility include but are not limited to, O&G, pH, TSS, N+N, iron, aluminum, zinc, copper.

90.      The industrial areas and associated activities generate and release pollutants at the Facility which are discharged in storm water to a municipal drainage ditch running along San Fernando Boulevard which flows into the Tujunga Wash which empties into

Complaint for Declaratory and Injunctive      20
and Civil Penalties Relief

the Los Angeles River.

91.     Pursuant to the Facility SWPPP, storm water from two drainage areas at the Facility flows to two discharge points, where (during sampling events), it is sampled prior to discharge to the Municipal Separate Storm Sewer System. Drainage Area 1 included the loading docks, a truck and trailer parking area, a waste storage area, a maintenance area, and a materials storage area. Drainage Area 2 included the vehicle washing area and a truck and trailer parking area.

92.     The Facility property lies relatively flat sloping slightly slope to the southeast with an elevation ranging from 870 feet to 890 feet above sea level. Surface drainage flows towards Art Street and then San Fernando Road (Drainage Area 2) and to San Fernando Road (Drainage Area 1) to into a municipal drainage ditch at the intersection of Art Street and San Fernando Road. Storm water is conveyed through the drainage ditch to the Tujunga Wash which flows into the Tujunga Wash which empties into the Los Angeles River and ultimately flows to the Pacific Ocean at Queensway Bay.

93.     The Tujunga Wash, the Los Angeles River and the Pacific Ocean are waters of the United States within the meaning of the CWA.

**B.    Los Angeles River and Queensway Bay**

95.     LA Waterkeeper and its members utilize the Tujunga Wash, the Los Angeles River and Queensway Bay for research, study, and recreation. LA Waterkeeper monitors the water quality, insect populations, and habitat at multiple locations in the Los Angeles River.

96.     The Los Angeles River provides critical habitat for species, including many that are endangered, threatened, rare, and endemic to Southern California. The concrete-lined sections provide wading habitat for shorebirds that have few other options, given that the majority of Los Angeles' wetlands have been destroyed. The Los Angeles River estuary provides a rich brackish habitat at the intersection of freshwater and saltwater environments. These river reaches support endangered species, including the Least bell's vireo, Western yellow-billed cuckoo, Willow flycatcher, and Tri-colored blackbird. They

also support species of special concern, such as the Santa Ana sucker, arroyo chub, California brown pelican, yellow-breasted chat, long-billed curlew, bank swallow, and the California red-legged frog. These habitats remain vulnerable, however. Past habitat destruction and pollution have led to the extirpation of many species, including the western pond turtle and the steelhead trout, and many species listed here are likely to be extirpated in the near future.

97.    Queensway Bay is the outlet for the Los Angeles River, at Junipero Beach, located in Long Beach. The surrounding area was formerly wetlands but is now heavily developed and contains a marina, restaurants, and businesses. Ample recreational opportunities exist in and around the bay, including water contact sports such as kayaking, sailing, stand-up paddle boarding, rowing, and jet skiing, and other activities such as walking, bicycling, boating. The bay provides habitat for an abundant variety of aquatic and bird species and other wildlife.

**C.    The Facility Storm Water Permit Coverage**

98.    SMARTS lists the current Facility WDID number for the Facility as 4 19I020941 and coverage under the Storm Water Permit as "Active."

99.    The NOI for the Facility lists the Receiving Water as the Pacific Ocean. The 2018 SWPPP states that that the Receiving Water is the Tujunga Wash which flows into to the Los Angeles River and ultimately into the Los Angeles River Estuary and the Pacific Ocean at Queensway Bay.

100.    Via search of the SMARTS database, LA Waterkeeper obtained a SWPPP for the Facility revised in October 2020.

101.    LA Waterkeeper is informed and believes, and thereon alleges, that Estes been operating with an inadequately developed or implemented SWPPP in violation of General Permit requirements since at least February 10, 2017. Estes has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary, resulting in the Facility's unlawful effluent limitation violations.

102.    LA Waterkeeper is informed and believes, and thereon alleges, that the

Complaint for Declaratory and Injunctive      22
and Civil Penalties Relief

Facility Owners/Operators failed to implement any additional BMPs as required by the General Permit. As such, the Owners and/or Operators are in daily violation of this requirement of the General Permit.

103.   LA Waterkeeper is informed and believes, and thereon alleges, that Facility Owners/Operators have failed to implement BMPs that achieve compliance with Storm Water Permit or the CWA.

104.   LA Waterkeeper is informed and believes, and thereon alleges, that pollutants associated with the Facility include, but are not limited to: aluminum, copper, zinc, nitrate + nitrite nitrogen, TSS, O&G, and iron.

105.   LA Waterkeeper is informed and believes, and thereon alleges, that Estes has failed to implement the minimum BMPs required by the General Permit, including good housekeeping requirements; preventive maintenance requirements; spill and leak prevention and response requirements; material handling and waste management requirements; erosion and sediment controls; employee training and quality assurance; and record keeping. General Permit, Sections X.H.1(a)-(g).

106.   LA Waterkeeper is informed and believes, and thereon alleges, that Estes has further failed to implement sufficient advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs; containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs necessary to comply with the General Permit's effluent limitations. General Permit, Sections X(H)(2). The Facility SWPPP references deployment of wattles as current advanced BMPs used at the Facility.

107.   LA Waterkeeper is informed and believes, and thereon alleges, that there are also insufficient minimal BMPs implemented, such as good housekeeping.

108.   LA Waterkeeper is informed and believes, and thereon alleges, that Defendant has failed to collect sufficient storm water samples for analyses, in violation of the Storm Water Permit, since at least February 10, 2017.

109.   LA Waterkeeper is informed and believes, and thereon alleges, that storm

water containing excess levels of TSS, N+N, zinc, iron, copper, and aluminum occur each time storm water discharges from Facility in violation of the Storm Water Permit Discharge Prohibitions III(C)-(D), Receiving Water Limitations VI(A)-(B).

110.   LA Waterkeeper is informed and believes, and thereon alleges, that the repeated and significant exceedances of Benchmark Levels demonstrate that the Owners/Operators have failed and continue to fail to develop and/or implement BMPs to prevent the exposure of pollutants to storm water and to prevent discharges of polluted storm water and non-storm water from the Facility.

111.   LA Waterkeeper is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to evaluate the effectiveness of its BMPs and adequately revise the Facility SWPPP, despite repeated and significant concentrations of pollutants in Facility's storm water discharges. Further, Defendant has failed to make changes to the Facility's training programs, or make any other changes based upon events that would signal a need for required revisions or alteration of practices.

112.   LA Waterkeeper is informed and believes, and thereon alleges, that pollutants, including but not limited to those referenced herein, have been and continue to be tracked throughout the Facility's operation areas.

113.   LA Waterkeeper is informed and believes, and thereon alleges, that the Owners'/Operators' failure to properly address pollutant sources and pollutants results in the exposure of pollutants associated with its industrial activities to precipitation, and that this results in discharges of polluted storm water from Facility and into local waterways in violation of the Storm Water Permit and/or the CWA.

114.   LA Waterkeeper is informed and believes, and thereon alleges, that the Owners'/Operators' failure to properly address these pollutants and its sources results in the exposure of pollutants to precipitation, which carries these pollutants with storm water flows from Facility into the Receiving Waters.

**D.   Storm Water Discharges from the Facility**

115.   As discussed above and as detailed in the Facility SWPPP, there are two discharge points at the Facility where storm water leaves the Facility and enters a municipal drainage ditch which flows to the Tujunga Wash.

116.   LA Waterkeeper is informed and believes, and thereon alleges, that Estes has self-reported NAL exceedances from the Facility over the past five (5) reporting years and is currently in the State Board's Exceedance Response Action ("ERA") Program for NAL exceedances of zinc, nitrate plus nitrite nitrogen, copper and TSS. In previous reporting years over the prior five years, the Facility has also been in the ERA Program for selenium, TSS, zinc, iron, and nitrate plus nitrite nitrogen.

### E.   The Facility's Storm Water Discharges to the Receiving Waters Contain Elevated Levels of Pollutants

117.   LA Waterkeeper is informed and believes, and thereon alleges, that pollutants from the Facility discharge with storm water into the Tujunga Wash which empties into the Los Angeles River which flows to its estuary and Queensway Bay.

118.   The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. 40 C.F.R. §120.2. The CWA requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. 40 C.F.R. § 122.21.

119.   LA Waterkeeper is informed and believes, and thereon alleges, that the Owners'/Operators' failure to properly address these pollutants and its sources results in the exposure of pollutants to precipitation, which carries these pollutants with storm water flows into Tujunga Wash and into the Los Angeles River, its estuary and Queensway Bay, all waters of the United States.

120.   Storm water discharges containing pollutants including, but not limited to,

heavy metals such as zinc, lead, and copper, and iron adversely affect the aquatic environment.

121.   Samples of storm water discharges collected at the Facility contain pollutants including TSS, zinc, N+N, and copper in excess of levels known to adversely impact aquatic species and the environment, federal regulations, WQS, Benchmarks, and the CTR (zinc, copper, lead) in violation of the Storm Water Permit's Effluent Limitations and Receiving Water Limitations.

122.   LA Waterkeeper is informed and believes, and thereon alleges, that during and/or after every significant rain event[4] or any other storm water or non-storm water discharge that has occurred at the Facility since February 10, 2017, through the present, Defendant has discharged and continues to discharge storm water and non-storm water from the Facility that contains concentrations of pollutants at levels that violate the prohibitions and limitations set forth in the Storm Water Permit, the Federal Effluent Limitations, the Benchmarks, CTR, and the WQS.

## F.   Defendant's Violations of the Storm Water Permit's Sampling, Reporting, and Monitoring Implementation Plan Requirements

123.   LA Waterkeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to develop an adequate Monitoring Implementation Plan ("MIP") for industrial operations at the Facility that complies with Section XI of the Storm Water Permit.

124.   LA Waterkeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to revise the MIP for the Facility as necessary to ensure compliance the Storm Water Permit in violation of with Section XI of the Storm Water Permit.

125.   LA Waterkeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to implement the MIP at the Facility, in violation

---

[4] A significant rain event is an event that produces storm water runoff, which according to EPA occurs with more than 0.1 inches of precipitation.

of Section XI of the Storm Water Permit.

126.   LA Waterkeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to collect or analyze sufficient storm water samples at the Facility, in violation of Section XI of the Storm Water Permit.

127.   LA Waterkeeper is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to sample storm water discharges from all discharge locations, in violation of Section XI of the Storm Water Permit.

128.   LA Waterkeeper is informed and believes, and thereon alleges, that the Owners/Operators of the Facility consistently fail to perform visual observations of storm water during QSEs.

129.   LA Waterkeeper is informed and believes, and thereon alleges, that the Owners/Operators of the Facility have consistently failed and continue to fail to report any noncompliance with the Storm Water Permit at the time that the Annual Report is submitted.

130.   LA Waterkeeper is informed and believes, and thereon alleges, that the Owners/Operators did not report their non-compliance as required by the Storm Water Permit.

131.   LA Waterkeeper is informed and believes, and thereon alleges, that the Facility's ERA Report resulting from samples recorded in the 2020-2021 reporting year was insufficient.

132.   LA Waterkeeper is informed and believes, and thereon alleges, that the Owners/Operators of the Facility fail to collect sufficient storm water samples during QSEs.

133.   Information available to LA Waterkeeper are informed and believe, and thereon allege, that BMPs proffered as implemented in the Facility SWPPP are insufficient and ineffective in reducing pollutants to levels compliant with the Storm Water Permit and/or the CWA.

134.   LA Waterkeeper is informed and believes, and thereon alleges, that

Defendant has failed to submit complete Annual Reports to the Regional Board for the past five reporting years in violation of Section XVI of the Storm Water Permit.

## VI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Discharges of Contaminated Storm Water in Violation of
the Storm Water Permit's Effluent Limitations and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

135.   LA Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

136.   LA Waterkeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

137.   LA Waterkeeper is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time storm water discharges from the Facility. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Storm Water Permit and the CWA. *See* Storm Water Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).

138.   The Owners/Operators violate and will continue to violate the Storm Water Permit's Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

139.   LA Waterkeeper is informed and believes, and thereon alleges, that the Owners'/Operators' violations of Effluent Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

140.   Each day since at least February 10, 2017, that the Owners/Operators discharge storm water containing pollutants in violation of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

141.   By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 10, 2017, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

142.   An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm LA Waterkeeper has no plain, speedy, or adequate remedy at law.

143.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## SECOND CAUSE OF ACTION
**Violation of Section 301(a) of the Clean Water Act by Discharging Contaminated Storm Water in Violation of the Storm Water Permit's Numeric Effluent Limitations.**
**U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

144.   LA Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

145.   LA Waterkeeper is informed and believes, and thereon alleges, that Defendant failed and continue to fail to comply with the Storm Water Permit's Numeric Effluent Limitations.

146.   LA Waterkeeper is informed and believes, and thereon alleges, that Defendant violates, and will continue to violate the Storm Water Permit's Numeric Effluent Limitations each day that storm water discharges from the Facility. Storm Water Permit, Section V(C).

147.   LA Waterkeeper is informed and believes, and thereon alleges, that Defendant violated the Effluent Limitations of the Storm Water Permit and the Clean Water Act within the applicable statute of limitations, and such violations are ongoing

1   and continuous.

2       148.   LA Waterkeeper is informed and believes, and thereon alleges, that

3   Defendant's acts and omissions described herein constitute violations of individual terms

4   of the Storm Water Permit, compliance with which is required to lawfully discharge

5   pollutants to waters of the United States.

6       149.   LA Waterkeeper alleges that its members have been harmed by Defendant's

7   acts and omissions described herein and have standing to bring this suit.

8       150.   Each and every violation of the Storm Water Permit Effluent Limitations is

9   a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

10      151.   By committing the acts and omissions alleged above, Defendant is subject

11  to an assessment of civil penalties for each and every violation of the CWA occurring

12  from February 10, 2017, to the present, pursuant to Sections 309(d) and 505 of the

13  CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

14      152.   An action for injunctive relief is authorized by CWA Section 505(a),

15  33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above

16  would irreparably harm Plaintiff and the citizens of the State of California, for which

17  harm Plaintiff has no plain, speedy, or adequate remedy at law.

18      153.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a)

19  because an actual controversy exists as to the rights and other legal relations of the

20  Parties.

21      WHEREFORE, Plaintiff prays for judgment against Defendant as set forth

22  hereafter.

23  ### THIRD CAUSE OF ACTION
### Defendant's Discharges of Contaminated Storm Water in Violation of
24  ### the Storm Water Permit's Receiving Water Limitations and the Clean Water Act.
25  ### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

26      154.   LA Waterkeeper incorporates the allegations contained in the above

27  paragraphs as though fully set forth herein.

28      155.   LA Waterkeeper is informed and believes, and thereon alleges, that

discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment from the Facility occur each time storm water discharges from the Facility.

156.   LA Waterkeeper is informed and believes, and thereon alleges, that storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards, including but not limited to NELs, has discharged and continues to discharge from the Facility each time storm water discharges from the Facility.

157.   The Owners/Operators violate and will continue to violate the Storm Water Permit's Receiving Water Limitations each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS discharges from the Facility.

158.   LA Waterkeeper is informed and believes, and thereon alleges, that the Owners'/Operators' violations of Receiving Water Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

159.   Each and every violation of the Storm Water Permits' Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

160.   By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 10, 2017 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

161.   An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

162.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### FOURTH CAUSE OF ACTION
**Defendant's Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollutant Prevention Plan in Violation of the Storm Water Permit and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

163.   LA Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

164.   LA Waterkeeper is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to develop an adequate SWPPP for the Facility, in violation of the Storm Water Permit.

165.   LA Waterkeeper is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately implement a SWPPP for the Facility, in violation of the Storm Water Permit.

166.   LA Waterkeeper is informed and believes, and thereon alleges, that Owners/Operators have failed and continue to fail to adequately revise the SWPPP for the Facility, in violation of the Storm Water Permit.

167.   The Owners/Operators have been in violation of the Storm Water Permit at the Facility every day from February 10, 2017, to the present.

168.   The Owners'/Operators' violations of the Storm Water Permit and the CWA at the Facility are ongoing and continuous.

169.   The Owners/Operators will continue to be in violation of the Storm Water Permit and the CWA each and every day the Owners/Operators fail to adequately develop, implement, and/or revise the SWPPP for the Facility.

170.   Each and every violation of the Storm Water Permit's SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

171.   By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA

occurring from February 10, 2017, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

172. An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

173. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## FIFTH CAUSE OF ACTION
### Defendant's Failure to Adequately Develop, Implement, and/or Revise a Monitoring and Reporting Plan in Violation of the Storm Water Permit and the Clean Water Act.
### U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

174. LA Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

175. LA Waterkeeper is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to develop an adequate MIP for the Facility, in violation of the Storm Water Permit.

176. LA Waterkeeper is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately implement an MIP for the Facility, in violation of the Storm Water Permit.

177. LA Waterkeeper is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately revise an MIP for the Facility, in violation of the Storm Water Permit.

178. The Owners/Operators have been in violation of the Storm Water Permit's monitoring requirements at the Facility every day from February 10, 2017 to the present.

179.   The Owners'/Operators' violations of its Storm Water Permit's monitoring requirements and the CWA at the Facility are ongoing and continuous.

180.   The Owners/Operators will continue to be in violation of Section XI of the Storm Water Permit, and the CWA each and every day they fail to adequately develop, implement, and/or revise an MIP for the Facility.

181.   Each and every violation of the Storm Water Permit's MIP requirements at the Facility is a separate and distinct violation of the CWA.

182.   By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 10, 2017, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

183.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

184.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties. WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### SIXTH CAUSE OF ACTION
**Defendant's Failure to Report as Required by the Storm Water Permit in Violation of the Storm Water Permit and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

185.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

186.   Section XVI of the General Permit requires a permittee to submit an Annual Report to the Regional Board by July 1 of each year. Section XVI of the Permit requires that the Annual Report include a compliance checklist that indicates that a discharger

complies with and has addressed all applicable requirements of the Permit, an affirmation of visual observations and sampling results, an identification and explanation of any non-compliance, an identification of all revisions made to the SWPPP, within the reporting year, and the date of the Annual Evaluation. General Permit Section XVI. Laboratory reports of sample analysis, the annual comprehensive site compliance evaluation report, an explanation of why a permittee did not implement any activities required are also reporting requirements throughout the reporting year and our typically uploaded into the SMARTS portal.

187.   The Permit also requires a permittee whose discharges violate the General Permit's Receiving Water Limitations or water quality standards, such as, NALs, TMDLs, TMDL-Specific Numeric Action Levels and NELs to implement additional BMPs or other control measures that are tailored to that facility in order to attain compliance with the receiving water limitation. A Discharger that is notified by a Regional Board or who determines the discharge is causing or contributing to an exceedance of a water quality standard must comply with the Water Quality Based Corrective Actions in Section XX.B of the Permit and report to the Regional Board regarding same. *See* General Permit Section XX.B.

188.   LA Waterkeeper is informed and believes, and thereon alleges, that the Owners/Operators have failed to accurately report their non-compliance with the General Permit and correctly report storm water sampling analysis compliance in the Facility's Annual Reports. Further, the Facility ERA Report resulting from samples recorded in the 2017-2018 reporting year was insufficient, as evidenced by subsequent storm water sampling results over the NELs. As such, the Owners/Operators are in daily violation of the General Permit.

189.   The Facility Owners/Operators have been in violation of Sections XVI and XX of the Storm Water Permit since at least February 10, 2017.

190.   The Owners'/Operators' violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

191.   By committing the acts and omissions alleged above, the Owners/Operators of the Facility are subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 10, 2017, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

192.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

193.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## VII.   **RELIEF REQUESTED**

194.   Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.      A Court order declaring Defendant to have violated and to be in violation of Sections 301(a) and (b) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b); for its unlawful discharges of pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent standards limitations which include BAT/BCT requirements, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit and the CWA.

b.      A Court order enjoining Defendant from violating the substantive and procedural requirements of the Storm Water Permit and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342;

c.      A Court order assessing civil monetary penalties for each violation of the CWA occurring on or after November 2, 2015, of $59,937 per day, as permitted

by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2016);

      d.    A Court order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

      e.    Any other relief as this Court may deem appropriate.

Dated: October 17, 2022          Respectfully submitted,

          */s/ Anthony M. Barnes*
          Anthony M. Barnes
          AQUA TERRA AERIS LAW GROUP
          Attorneys for Plaintiff
          LOS ANGELES WATERKEEPER